**Ken VEGA, Plaintiff,**

v.

**John J. CALLAHAN,[1] Acting Commissioner, Social Security Administration, Defendant.**

**Civil No. 94–6369–FR.**

United States District Court,
D. Oregon.

Sept. 11, 1997.

Shirley S. Chater as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Arthur W. Stevens, III, Medford, OR, for Plaintiff.

Kristine Olson, U.S. Atty., Craig J. Casey, Asst. U.S. Atty., Portland, OR, Richard H. Wetmore, Special Asst. U.S. Atty., Social Security Admin., Seattle, WA, for Defendant.

## OPINION

FRYE, District Judge.

The plaintiff, Ken Vega, brings this action pursuant to section 205(g) of the Social Security Act (the Act), as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying his application for disability insurance benefits (DIB) and supplemental security income (SSI) benefits prior to April 1, 1992.

## BACKGROUND

Ken Vega filed an application for DIB and SSI benefits on February 27, 1992, with a protected filing date of November 19, 1991. The applications were denied initially and upon reconsideration. Vega's eligibility for DIB expired on March 31, 1991. Upon Vega's request for reconsideration, he was found to be disabled beginning on April 1, 1992, and thus his application for SSI benefits was partially granted. After a timely request for a hearing, Vega, represented by counsel, appeared on December 1, 1993 and testified before an Administrative Law Judge (ALJ), as did Linda Scruggs, his mother-in-law, and Silvia Walters, a family friend. The issues at the hearing were (1) whether Vega was disabled from December 1, 1990 through March 31, 1991 for determining his eligibility for DIB; and (2) whether Vega was disabled from November 19, 1991 through April 1, 1992 for determining his eligibility for SSI benefits prior to the time period for which he began receiving SSI benefits after reconsideration of his application for benefits.

On February 16, 1994, the ALJ found that Vega was not disabled within the meaning of the Act during the relevant time periods, and therefore he was not entitled to either DIB or SSI benefits for the period before April 1, 1992. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ.

## FACTS

1. *Vega's History*

Ken Vega was thirty years old at the time of the hearing on December 1, 1993. He contends that he became disabled in September of 1987 following the aggravation of a back injury caused by an accident at work in 1985. Vega applied for both DIB and SSI benefits because of chronic back and leg problems and anxiety and depression.

Vega has completed the tenth grade. He has worked as a circuit board plater, a furniture refinisher, and a pizza maker before being injured. After he was injured, he worked as a bartender for three weeks in September of 1991. He quit that job because the work increased his back and leg pain.

Vega has undergone two surgeries for his back problems. The second surgery occurred in January of 1990. Vega testified that he has had constant pain in his hip and leg since the second surgery. Vega has also suffered from anxiety attacks since his second surgery. During these anxiety attacks, Vega hyperventilates, shakes, and becomes confused.

Vega's back and leg problems require him to sit at an angle and to rest on his arms in order to alleviate the pain in his right hip and leg. He testified that he lies down 98% of the time; that he can sit or stand for a few minutes at a time; that he hardly walks at all; and that when he does walk, he has to use a cane. At times, his leg "gives out" causing him to fall. Vega cooks the meals for his family and mother-in-law, with whom he and his family live. At the time of the hearing, he was taking care of his two children while his wife was at work. He has a daughter who was three years old in February of 1991, and a son apparently born in May of 1992. Prior to April of 1992, Vega took care of his daughter, a toddler then, while his wife worked. Vega testified that he has trouble keeping up with his children, and he believes that they should not be left in his care. In May of 1991, Vega reported to a doctor that he left his house on most days to run errands.

Vega drank alcohol to excess and used street drugs after his second surgery because of the pain. He drank as much as a fifth to one-half gallon of alcohol a day at that time, but he claims to have been free of street drugs and alcohol for one and one-half

years prior to the time of the administrative hearing.

During the time that Dr. Peter Grant treated Vega, from November of 1990 until March of 1992, Vega took the drug Tagamet for stomach problems and the drugs Elavil, a mood elevating drug, and Soma, a muscle relaxant, but Dr. Grant did not prescribe narcotic pain medication because Vega had previously overused this kind of medication.

Vega attended a residential program at the Northwest Pain Center for approximately a week in June of 1991. He discontinued that program because he believed that the treatment was making him worse, both physically and mentally. At the time of the administrative hearing before an ALJ on December 1, 1993, Vega was taking the drug Elavil for depression, the drug Soma for muscle relaxation, the drug Darvocet for pain, and the drug Zantac for an ulcer. Vega was also receiving physical therapy several times a week and was exercising daily at home for about thirty minutes a day.

Vega has not been treated by a psychologist or a psychiatrist. He has a history of missing medical appointments and discontinuing nonpharmacological treatments.

At the time of the hearing, Vega and his family lived with his mother-in-law, Linda Scruggs. Scruggs and her friend, Silvia Walters, who has known Vega since he was seventeen years old, both testified at the hearing. Both admitted that they were not very fond of Vega, particularly when he was drinking and using street drugs. Scruggs testified that Vega spent a lot of time lying down; that she had heard him moaning in pain while sleeping; that he frequently rose in the middle of the night to take a warm shower to alleviate the pain in his leg; and that she has no doubt that he suffers from severe physical pain. She testified that Vega called her home while he was at the Northwest Pain Center. He was crying and was "absolutely distraught." Walters also has seen Vega crying in pain. She stated that Vega spent most of the day lying on the couch, floor, bed or recliner.

## 2. *The Physicians' Reports*

Dr. Peter Grant treated Vega from July 6, 1990 until January 8, 1992. He found that Vega suffered from a chronic pain syndrome, a chronic low back and right lower extremity pain syndrome, and a chronic and severe anxiety/adjustment reaction with mixed emotional features. As part of his treatment plan, Dr. Grant referred Vega to a chronic pain management program. On July 17, 1991, Dr. Grant released Vega to perform medium duty work with only occasional back stressing activities. Thereafter, Vega worked for three weeks as a bartender. On October 18, 1991, Vega reported to Dr. Grant that he had to quit the job of bartender because of increasing pain. Dr. Grant states in his report, "We discussed the fact that returning to any sort of work will be an unaccustomed activity and will most likely be met with increased symptoms for a while." Tr. 260. Dr. Grant continued to release Vega for medium duty work with limitations and stated that Vega's medical condition remained medically stationary. On January 8, 1992, Vega reported to Dr. Grant that he was continuing to look for another job. In a letter dated March 23, 1992 to the Disability Determinations Department of the State of Idaho, Dr. Grant states:

> Unfortunately Mr. Vega has a chronic pain syndrome and has a lot of secondary gain factors. I have found him to generally be fairly non compliant [sic] and seeking of pharmacologic remedies for his problems. He has a severe and chronic anxiety/adjustment reaction with mixed emotional features with regards to his long standing back discomfort.

Tr. 264.

Vega entered a residential multidisciplinary pain management program at the Northwest Pain Center in June of 1991, but checked himself out of that Center after less than a week. On February 19, 1991, prior to his admission to the Northwest Pain Center, the Center had diagnosed Vega with status post injury, lumbosacral spine; status post microdiskectomy; status post lumbar lami-

nectomy; chronic low back pain with evidence of root problems; anxiety disorder; somatic preoccupation with somatization[2] of stress and tension; mild depression with concomitant sleep disturbance, reduced self-esteem, irritability, decreased energy level, and emotional lability;[3] acute anxiety; passive-dependent characterological features; inappropriate use of alcohol, to alleviate anxiety attacks; and a history of polysubstance abuse, indicated by medical records. At that time, Vega told the Northwest Pain Center that when he was watching his three-year-old child during the day, he spent half of the day up and around and half of the day sitting or reclining.

On May 20, 1991, Vega was examined by Dr. Thomas Ewald, who noted that on the day of the examination, Vega displayed no inappropriate pain behavior or talk. Dr. Ewald agreed with the diagnoses of the other physicians, including that Vega had a "[s]omatic preoccupation with somatization of stress and tension, mild to moderate." Tr. 233. Dr. Ewald recommended that Vega participate in either a disability prevention program or a residential multidisciplinary pain program in order to learn how to cope with his pain. Dr. Ewald believed on May 20, 1991 that Vega would then be able to return to work and that his medications could be discontinued.

Dr. Alan Webb examined Vega on April 28, 1992. He agreed with earlier diagnoses and made the following recommendations:

> RECOMMENDATIONS: In my opinion, this patient is significantly and permanently disabled from his low back condition.... There may be a very sedentary job which this patient could perhaps work on a part-time [sic] basis. He would certainly have to be allowed the freedom of changing positions frequently, of not having to bend, stoop, stand or walk extensively, of not having to lift anything greater than 5 lbs. If such a position cannot be found within a reasonable amount of time, then I would

feel Mr. Vega to be totally disabled from his low back.

Tr. 271.

### 3. *The ALJ's Decision*

The ALJ found that Vega had a severe physical impairment related to his orthopedic problems (back and legs), but that his mental problems were not serious enough to constitute a severe mental impairment. The ALJ then found that Vega's severe physical impairment was not equal to one of the listed impairments which are conclusively presumed to be disabling. For the reasons explained below, the ALJ then found that Vega was not impaired enough to prevent him from performing his past relevant work of pizza maker. Thus, the ALJ found that Vega was not disabled under the Act during the relevant time periods.

The ALJ relied on the medical reports of Dr. Grant, Vega's treating physician during the relevant time periods, and the medical records of other physicians and medical care-givers from the relevant time periods, and found that Vega had the residual functional capacity for medium work during the relevant time periods.

The ALJ gave controlling weight to Vega's treating physician, Dr. Grant, rather than to his examining physician, Dr. Webb, for the following reasons: Dr. Webb examined Vega only once, and that was shortly after the relevant time periods had ended; Dr. Webb relied to a large extent on the subjective reports of Vega, which the ALJ rejected; Dr. Webb's conclusion that Vega could only perform part-time sedentary work was inconsistent both with Vega's testimony at the time that he was caring for his three-year-old child and looking for a job and with Dr. Grant's conclusion that Vega could do medium work; Dr. Grant treated Vega many times during the relevant time periods; Dr. Grant's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques; Dr. Grant's conclusion is consistent with the opinion of the Northwest Pain Center; and Dr. Grant's conclusion is

---

**2.** The conversion of mental experiences or states into bodily symptoms.

**3.** Alternating states of gaiety and somberness.

consistent with Vega's own description of his daily activities.

The ALJ also found that Vega's testimony about the pain he suffered and other subjective complaints was not credible. The ALJ concluded that Vega's testimony that he was in constant debilitating pain after the second surgery in January of 1990 and that he had to lie down much of each day was inconsistent with the statements he made to his doctors that he was doing housekeeping chores, running errands, and caring for a three-year-old child all day. Vega had also told Dr. Grant that he wanted to find a job during that period. His subjective complaints are inconsistent with Dr. Grant's observations and conclusion that he could perform medium work. The ALJ also relied on the fact that Dr. Grant suspected that Vega's reported problems were motivated by secondary gain factors. Thus, the ALJ concluded that Vega's subjective complaints were considerably exaggerated.

## CONTENTIONS OF THE PARTIES

Vega contends that the ALJ erred as a matter of law by failing to give proper consideration to (1) the objective medical evidence which showed that Vega's impairment could reasonably be expected to produce the symptoms about which he testified; (2) the testimony of the non-medical witnesses concerning his pain and depression; (3) the record as a whole in making his credibility finding concerning Vega's subjective pain; and (4) the combined effect of Vega's physical and mental impairments.

The Commissioner contends that the ALJ's findings are supported by substantial evidence and should be affirmed.

## LEGAL STANDARDS

The Social Security Act (the Act) provides for the payment of disability insurance benefits (DIB) to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income (SSI) benefits may be available to individuals who are age sixty-five or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

■ The burden of proof to establish a disability rests upon the claimant. *Gomez v. Chater,* 74 F.3d 967, 970 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 209, 136 L.Ed.2d 144 (1996) (DIB); *Drouin v. Sullivan,* 966 F.2d 1255, 1257 (9th Cir.1992) (SSI). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI benefits due to a disability. 20 C.F.R. §§ 404.1520 and 416.920; *Lester v. Chater,* 81 F.3d 821, 828 n. 5 (9th Cir.1995) (DIB); *Quang Van Han v. Bowen,* 882 F.2d 1453, 1456 (9th Cir.1989) (SSI). First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activi-

ty. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Distasio v. Shalala,* 47 F.3d 348, 349 (9th Cir.1995) (DIB); *Drouin,* 966 F.2d at 1257(SSI). The claimant is entitled to disability benefits only if he or she is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

When an individual seeks either DIB or SSI benefits because of disability, judicial review of the Commissioner's decision is guided by the same standards. 42 U.S.C. §§ 405(g) and 1383(c)(3). This court must review the case to see if the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Drouin,* 966 F.2d at 1257. It is more than a scintilla, but less than a preponderance, of the evidence. *Id.; Gonzalez v. Sullivan,* 914 F.2d 1197, 1200 (9th Cir.1990). Even if the Commissioner's decision is supported by substantial evidence, it must be set aside if the proper legal standards were not applied in weighing the evidence and in making the decision. *Gonzalez,* 914 F.2d at 1200. The court must weigh both the evidence that supports and detracts from the Commissioner's decision. *Id.* The trier of fact, and not the reviewing court, must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the Commissioner. *Gomez,* 74 F.3d at 970.

■ The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995). More weight is given to the opinion of a treating physician because the treating physician has a greater opportunity to know and observe the patient as an individual. *Id.; Smolen v. Chater,* 80 F.3d 1273, 1285 (9th Cir.1996). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Lester,* 81 F.3d at 830. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Id.* at 831.

■ When deciding whether to accept the subjective testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must (1) produce objective medical evidence of one or more impairments; and (2) show that the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. *Smolen v. Chater,* 80 F.3d 1273, 1281–82 (9th Cir.1996). The claimant is not required to produce objective medical evidence of the symptom itself, the severity of the symptom, or the causal relationship between the medically determinable impairment and the symptom. The claimant is also not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. *Id.* at 1282. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptom. If there is no affirmative evidence of malingering, the ALJ may reject the claimant's

testimony only if the ALJ makes specific findings stating clear and convincing reasons for the rejection, including which testimony is not credible and what facts in the record lead to that conclusion. *Id.* at 1284.

## ANALYSIS AND RULING

■ The issue before the court is whether Vega was disabled prior to April 1, 1992. The ALJ's finding that Vega was not disabled prior to April 1, 1992 is based on three findings. First, the ALJ subscribed to the opinion of the treating physician, Dr. Grant, and rejected the opinion of the examining physician, Dr. Webb. In doing so, the ALJ provided specific and legitimate reasons supported by substantial evidence in the record, as summarized above and as required by the case law. The ALJ correctly decided this issue.

Second, the ALJ found that Vega's testimony concerning his subjective complaints of pain and emotional problems was not credible. In his analysis, the ALJ found that Vega had met the first prong of the two-part test in that he produced objective medical evidence of an impairment in his back and evidence that the impairment could reasonably be expected to produce some degree of pain. The ALJ made specific findings and stated clear and convincing reasons for rejecting Vega's testimony. The ALJ stated which testimony he found not to be credible and stated what facts in the record led to this conclusion. In discrediting Vega's testimony, the ALJ used the correct legal standards and supported his findings by articulating substantial evidence in the record upon which he relied. The court finds that the testimony of witnesses Scruggs and Walters regarding Vega's symptoms and daily activities is competent evidence. *See Sprague v. Bowen,* 812 F.2d 1226, 1232 (9th Cir.1987). This evidence, however, is inconsistent with Vega's self-reported daily activities.

Third, the ALJ found that Vega's residual functional capacity for medium work was not further reduced by the nonexertional limitation associated with mental impairment. The ALJ noted that Vega's self-reports of mental and emotional problems contradict the physicians' conclusions that he had minor mental problems that were not severe. An additional fact indicating that the mental problems were not severe is that Vega received only minimal treatment for mental problems— prescriptions for Elavil but no treatment from a psychologist or psychiatrist. Because he did not find that Vega suffered from severe mental impairments during the relevant time periods, the ALJ concluded that Vega did not have any significant mental limitations. The court finds that the ALJ's conclusion on the interrelationship of Vega's physical and mental problems is supported by substantial evidence.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards, and therefore the court affirms the decision of the Commissioner.